UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BUSEY BANK, | ) | |
| an Illinois Banking Corporation, | ) | CASE NO. 1:21-cv-1526 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| FLAGSTAR BANK, FSB; | ) | |
| CHRISTA A. SMITH; | ) | |
| CASEY JOANNE-ELAINE WILSON; | ) | |
| KIMBERLY ANN SANNELLA; | ) | |
| KYLE R. BERNFIELD; | ) | |
| MARK THOMAS DIETRICH; and | ) | |
| KELLIE MARIE LAMONACA, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Busey Bank, an Illinois Banking Corporation (hereinafter "Busey Bank" or "Plaintiff"), by and through its undersigned counsel, brings this Complaint against Defendants Christa A. Smith ("Smith"), Casey Joanne-Elaine Wilson ("Wilson"), Kimberly Ann Sannella ("Sannella"), Kyle R. Bernfield ("Bernfield"), Mark Thomas Dietrich ("Dietrich"), and Kellie Marie LaMonaca ("LaMonaca") (collectively "Former Employee Defendants") and their new employer, Flagstar Bank, FSB ("Flagstar," and collectively with the Former Employee Defendants, "Defendants"). This action results from Flagstar's improper scheme to build and expand its business by raiding Busey Bank's employees and misusing the proprietary and trade secret information they possess, all in violation of law, rather than through fair competition. The scheme involved the coordinated resignations of the Former Employee Defendants from Busey Bank, before, during, and after which the Former Employee Defendants demonstrated their

absolute intention to ignore their respective protective agreements in order to join Flagstar, one of Busey Bank's competitors, and compete with Busey Bank in the mortgage loan origination industry, inevitably using and disclosing Busey Bank's trade secrets to Flagstar's benefit. Busey Bank brings this Complaint against the Former Employee Defendants for, *inter alia*: (I) misappropriation and inevitable disclosure of Busey Bank's trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq (the "DTSA"); (II) breaches of contract, including non-solicitation and confidentiality covenants; (III) breaches of fiduciary duties, and (IV) intentional tortious interference with Busey Bank's business relationships and its contracts; and against Flagstar for, *inter alia*: (I) threatened misappropriation of Busey Bank's Trade Secrets under the DTSA, (II) unfair competition, (III) intentional tortious interference with Busey Bank's business relationships and its contracts with the Former Employee Defendants, and (IV) inducing the Former Employee Defendants to breach their fiduciary duties to Busey Bank. Busey Bank seeks temporary and preliminary injunctive relief, monetary damages, and the recovery of its attorney's fees and costs. In support of the relief requested herein, Busey Bank alleges as follows:

## I.      <u>NATURE OF THE ACTION</u>

1.      This case involves egregious and intentional violations by employees of their obligations to their employer for the benefit of themselves and their new employer.

2.      Busey Bank is an Illinois-based bank that engages, on its own behalf and on behalf of its customers, in various banking and wealth management services through which it provides, *inter alia*, all manner of banking and mortgage loan origination and refinancing services and other related financial products along with asset management, investment, and fiduciary services to individuals, businesses, and foundations. Busey Bank's provision of these products and services is made possible through its generation, maintenance, and protection of confidential information,

including, but not limited to, market studies and strategies, financial studies and data, sales programs and price strategies, mathematical models, computer programs, statistical methods and algorithms, and the personal confidential information of customers which Busey Bank generates via targeted marketing efforts and community goodwill (collectively, "The Busey Bank Trade Secrets").

3.    Busey Bank has devoted substantial time, effort, and resources in developing its customer base and networks, workforce, and confidential and proprietary technology and information and The Busey Bank Trade Secrets. Busey Bank invests millions of dollars researching and developing The Busey Bank Trade Secrets for its business. The information provides Busey Bank with a competitive advantage in the market and generates substantial profits annually for Busey Bank. Busey Bank takes appropriate steps to maintain the secrecy of The Busey Bank Trade Secrets, including, among other things, requiring employees involved in developing and using The Busey Bank Trade Secrets to sign confidentiality and non-solicitation agreements.

4.    The Former Employee Defendants, through the course of their employment with Busey Bank, became privy to The Busey Bank Trade Secrets, obtained access to Busey Bank's proprietary information and were given direct contact with Busey Bank's customers, carriers, vendors, suppliers, employees, and independent contractors.

5.    In the second half of 2020, Flagstar and the Former Employee Defendants, along with several other former Busey Bank employees, worked together to coordinate the staggered and mass-resignation of twenty-one Busey Bank employees across six offices in two states, Illinois and Indiana. The individuals not named in the caption of this action are: Michael G. Turney ("Turney"), David Besler ("Besler"), Milissa Ommen-Welborn (Ommen-Welborn"), Randall Clark ("Clark"), Barbara Weidner ("Weidner"), Kirk Tjernagel ("Tjernagel"), Ron Briscoe

("Briscoe"), Sandra Vick ("Vick"), Keith Frank Mouis ("Mouis"), Joseph Riley Mongiovi ("Mongiovi"), Nicholas W. Villareal ("Villareal"), Bradley David Gish ("Gish"), Keri Kikta ("Kikta"), Jeffrey Hopper ("Hopper"), and Deborah Stoch ("Stoch") (collectively, the "Related Individuals").

6.      The Former Employee Defendants and the Related Individuals worked in the following offices: Carmel Mortgage Suite in Indiana, the North Veterans Bloomington office, the Yorkville Mortgage office, the Downtown Naperville office, the Plainfield office, and the Homer Glen office, all of which are situated within Illinois. Following the mass-resignations of these individuals, these offices were left with no Busey Bank employees, thus destroying their economic viability. Due to this economic decimation, Busey Bank had to incur significant costs associated with recruiting, screening, hiring, and training employees and re-staffing the offices.

7.      Prior to these resignations, Flagstar worked primarily with Turney, who while still employed by Busey Bank solicited the Former Employee Defendants and Related Individuals both in conjunction with Flagstar and on Flagstar's behalf.

8.      By hiring en masse the Former Employee Defendants and the Related Individuals identified in Paragraph 5 herein, Flagstar has engaged in an improper effort to develop its own business by misappropriating the customer goodwill, relationships, and knowledge of confidential and proprietary information that the Former Employee Defendants and Related Individuals acquired through their employment with Busey Bank.

9.      Flagstar's brazen and systematic poaching of Busey Bank's former employees constitutes tortious interference with Busey Bank's contractual relations with its former employees, the misappropriation of The Busey Bank Trade Secrets, and unfair competition. Furthermore, each Former Employee Defendant induced and conspired with Flagstar and other Former Employee

Defendants and Related Individuals to breach their duties of loyalty and/or post-employment obligations to Busey Bank and to misappropriate The Busey Bank Trade Secrets.

10.     Permitting Defendants' continued misconduct, including, without limitation, their contractual breaches, tortious interference, the actual or threatened misappropriation of The Busey Bank Trade Secrets, and unfair competition, will allow Flagstar—now a direct Busey Bank competitor—to succeed in its scheme with the Former Employee Defendants of improperly appropriating Busey Bank's goodwill and gaining an unfair competitive advantage, all without the need to invest the significant time and money required to develop customer and carrier relationships, a skilled and stable workforce, and successful business strategies.

11.     Irreparable harm has resulted and will continue to result to Busey Bank from Flagstar's systematic raiding of Busey Bank's employees, as well as from the Former Employee Defendants' continuous violations of their respective agreements with Busey Bank. As such, Busey Bank requires injunctive relief to protect itself from such grave commercial misconduct.

12.     Busey Bank also seeks all damages resulting from Defendants' past, current, and continuing misconduct.

## II.    PARTIES AND RELATED INDIVIDUALS

13.     Plaintiff Busey Bank is an Illinois banking corporation with its headquarters and principal place of business in Champaign, Illinois. At all times relevant hereto, Busey Bank operated and maintained an office located at 11550 N Meridian Street Suite 100, Carmel, IN 46032 (the "Carmel Office") and does substantial business in the state of Indiana.

14.     Defendant Flagstar is a Michigan corporation with its headquarters and principal place of business in Troy, Michigan, and offices in Indiana, Illinois, Michigan, Wisconsin, and Ohio. Flagstar provides similar services to Busey Bank and therefore competes with it.

15.    Upon information and belief, each of the Former Employee Defendants both reside and work in the state of Indiana.

16.    Prior to becoming employed with Flagstar, each of the Former Employee Defendants was employed by Busey Bank in Indiana.

17.    Smith was employed by Busey Bank from October 16, 2017 until August 28, 2020.

18.    Wilson was employed by Busey Bank from November 1, 2018 until August 7, 2020.

19.    Sannella was employed by Busey Bank from November 1, 2018 until July 24, 2020.

20.    Bernfield was employed by Busey Bank from September 6, 2018 until August 28, 2020.

21.    Dietrich was employed by Busey Bank from September 17, 2018 until September 28, 2020.

22.    LaMonaca was employed by Busey Bank from June 26, 2017 until September 4, 2020.

23.    The Related Individuals' employments with Busey Bank ended as follows:  Turney (August 25, 2020), Besler (October 23, 2020), Ommen-Welborn (October 23, 2020), Clark October 23, 2020), Weidner (July 24, 2020), Tjernagel (August 28, 2020), Briscoe (October 23, 2020), Vick (October 23, 2020), Mouis (September 4, 2020), Mongiovi (August 28, 2020), Villareal (July 24, 2020), Gish (September 1, 2020), Kikta (August 29, 2020), Hopper (August 22, 2020), and Stoch (August 29, 2020).

24.    Currently, each of the Former Employee Defendants is employed by Flagstar in Indiana, and the Related Individuals are employed by Flagstar in Illinois.

### III.    <u>JURISDICTION AND VENUE</u>

25.    This Court has subject matter jurisdiction over this action. Busey Bank's claims raise a federal question under both the DTSA[1] and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030

---

[1] Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq.

*et seq.* The Court has supplemental jurisdiction over Busey Bank's other claims pursuant to 28 U.S.C. § 1367.

26.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because this is a judicial district in which at least one of the Defendants reside, and the remaining Former Employee Defendants are domiciled in Indiana. Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(1) because Flagstar does business in the district.

27.    Venue is further proper in this judicial district under 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to Busey Bank's claims occurred.

28.    This Court has subject matter jurisdiction over the claims asserted by Busey Bank against Defendants.

## IV.    <u>PRELIMINARY STATEMENT</u>

29.    Flagstar collaborated and conspired with the Former Employee Defendants in a concerted effort to coordinate a staggered, mass-resignation of numerous Busey Bank employees, thereby decimating Busey Bank's mortgage loan originator workforce across six offices in two states. Flagstar worked primarily with Turney to engage in this improper effort to develop its own business by misappropriating the customer goodwill, relationships, and knowledge of confidential and proprietary information that the Former Employee Defendants and Related Individuals acquired through their employment with Busey Bank.

30.    Flagstar coordinated with the Former Employee Defendants to solicit the Related Individuals while they were still employed by Busey Bank. At the time, Turney was employed as Senior Vice President – Mortgage Sales Division. Prior to resigning with Busey Bank, Turney and several of the Former Employee Defendants worked with Flagstar to actively solicit and encourage

over 20 other Busey Bank employees to leave Busey Bank and join Flagstar, thereby breaching their fiduciary duties to their employer. Many of the Busey Bank employees solicited were individuals over whom Turney had direct supervision in his role as Senior Vice President – Mortgage Sales Division. Additionally, in her role as Regional Sales Manager, LaMonaca had direct supervision over the remainder of the Former Employee Defendants and, while still employed with Busey Bank, used that influence to solicit, encourage, and assist other employees to leave Busey Bank to join Flagstar and to misappropriate The Busey Bank Trade Secrets.

31.    Turney has already begun his employment with Flagstar. Both before and after his resignation from Busey Bank, Turney worked in concert with Flagstar to wrongfully solicit Busey Bank employees and customers and continues to do so.

32.    Busey Bank has discovered evidence that several of the Former Employee Defendants intentionally absconded with The Busey Bank Trade Secrets by—and potentially among other methods—sending themselves and each other emails containing customer lists replete with confidential information that the Former Employee Defendants would not have known or had access to but for their employment with Busey Bank.

33.    Accordingly, Busey Bank requires and respectfully requests damages and injunctive relief to prevent the Former Employee Defendants and Flagstar from further soliciting Busey Bank employees and customers to preserve the *status quo ante*, to protect Busey Bank's goodwill and The Busey Bank Trade Secrets, and to prevent Turney and Flagstar from causing additional damage to Busey Bank.

## STATEMENT OF OPERATIVE FACTS

### *The Participation Agreements*

34.    The vast majority of the Former Employee Defendants and Related Individuals have signed an enforceable "Participation Agreement" ("Agreement") with Busey Bank containing confidentiality and non-solicitation provisions.

35.    The Agreement contains numerous terms specifically intended to protect Busey Bank's customer relationships and information, information technology, training programs, business plans, and other confidential or proprietary information to which the Former Employee Defendants were granted access in order to perform the responsibilities of their jobs. The Agreements signed by the Former Employee Defendants are attached as **Exhibits A-E**.

36.    The Agreements contain a robust confidentiality provision in which the Participant "acknowledges that the nature of Participant's employment requires that Participant produce and have access to records, data, Trade Secrets and information that are not available to the public ('Confidential Information')." *See Agreements,* attached as **Exhibits A-E**, at Section 1.

37.    The Agreements further include a provision regarding computer use and authorization, which provides as follows:

> Participant's access to and use of Busey's computer systems, networks and equipment, and all Busey information contained therein, shall be restricted to legitimate business purposes on behalf of Busey; any other access to or use of such systems, network and equipment is without authorization and is prohibited. The restrictions contained herein shall extend to any personal computers or other electronic devices of Participant that are used for business purposes relating to Busey. Participant shall not transfer any Busey information to any personal computer or other electronic device that is not otherwise used for any business purpose relating to Busey. Participant shall promptly return all originals and copies of any Confidential Information and other records, files, documents and other materials to Busey if Participant's employment with Busey is terminated for any reason. Participant acknowledges that violation of this Section 2 may subject Participant to both criminal and civil liability.

*See id.* at Section 2.

38.     The Agreements also include a non-solicitation covenant, which provides that for a 12-month period following the Participant's termination for any reason, the Participant shall not solicit Busey Bank's customers or employees. *See id.* at Section 5(a-b).

39.     The Agreements include a non-disparagement provision, which states that "Participant agrees that upon termination of Participant's employment for any reason Participant will not make any disparaging remarks about Busey or in any way demean the reputation of Busey or its employees, products or services." *See id.* at Section 6.

40.     Finally, the paragraph entitled "Remedies for Breach" clearly states that Busey Bank is entitled to injunctive relief for violations of the Agreement:

> [I]n the event of any violation or threatened violation of the restrictions contained in this Agreement, Busey, in addition to and not in limitation of, any other rights, remedies or damages available to Busey under this Agreement or otherwise at law or in equity, shall be entitled to preliminary and permanent injunctive relief to prevent or restrain any such violation by Participant and any and all persons directly or indirectly acting for or with him or her, as the case may be.

*See id.*

41.     Further, and in addition to the provisions within the Agreements, Busey Bank has implemented a number of policies that directly address access to and acceptable uses of Busey Bank's systems. The relevant portions of these policies are described at length by Ms. Kerri Doll, in her Declaration attached hereto as **Exhibit F**. In short, these policies provide that Busey Bank employees (a) must only "use their privileged access for appropriate, legitimate, business required functions of Busey"; (b) "[a]ll business, privileged users must perform actions in a manner that maintains the confidentiality, integrity, and availability for all Busey information;" and (c) Busey Bank employees shall not "[r]eveal or publicize confidential or proprietary information which includes, but is not limited to: financial information, confidential client information, marketing

strategies and plans, databases and any information contained therein, client lists, computer software source codes, computer/network access codes, and business relationships." *See id.*

42.    The Former Employee Defendants breached each of the above provisions, along with the various provisions of Busey Bank's Electronic Resources Acceptable Use Policy and Information Security Policy, and Flagstar aided, abetted, induced, and encouraged the breaches. As such, Busey Bank is entitled to, among other things, injunctive relief to enjoin any additional breaches and prevent further harm.

### ***The Former Employee Defendants Conspired With Flagstar to Solicit Each Other While Still Employed By Busey Bank***

43.    Turney and LaMonaca are former Busey Bank employees and officers. At the time they resigned from Busey Bank, Turney was employed as Senior Vice President - Mortgage Sales Division and LaMonaca was Regional Sales Manager.

44.    In connection with their employment and managerial roles at Busey Bank, they oversaw numerous Busey Bank employees, including the former Busey Bank employees identified in this action, who were responsible for originating loans that generate millions of dollars in annual revenues and profits for Busey Bank.

45.    The Former Employee Defendants and Related Individuals were provided with access to Busey Bank's extensive client records and information. Busey Bank paid them and provided them with opportunities to develop, cultivate, and maintain relationships with its clients, many of whom have now moved their relationships to Flagstar. At last count, the Former Employee Defendants and Related Individuals identified herein have solicited and transferred over 950 loan payoffs amounting to over $100 million from Busey Bank to Flagstar.

46.    There is no rational explanation for the Related Individuals and Former Employee Defendants taking over 950 separate loans in just a few short months, other than that the Former

Employee Defendants and Related Individuals utilized The Busey Bank Trade Secrets to identify and solicit the business of Busey Bank's customers.

47.    Further, many Former Employee Defendants and Related Individuals had numerous loans in their "pipelines" at Busey Bank. "Pipeline" refers to mortgage loans that are locked-in with a mortgage originator by borrowers, mortgage brokers, or other lenders. A loan stays in an originator's pipeline from the time it is locked until it falls out, is sold into the secondary mortgage market, or is put into the originator's loan portfolio. In this case, many of the loans in Busey's pipeline have fallen out and moved over to Flagstar, resulting in millions of dollars of lost revenue to Busey Bank.

48.    The identities and contact information of Busey Bank's clients is valuable to competitors such as Flagstar because the information identifies customers who generate significant revenues, particularly in this time when roughly half of Busey's business is being generated from existing customers refinancing their loans due to historically low interest rates. Busey Bank's competitors such as Flagstar can unfairly benefit from this information because it enables them to target their financial products, services, and marketing efforts to a pre-selected group of clients without the need to spend the significant amount of time, money, and resources Busey Bank has spent to generate its goodwill and identify and develop such clients.

49.    Busey Bank takes concerted action to preserve the confidentiality of its employee and client information.

50.    Busey Bank's review of the circumstances surrounding the co-solicitation of employees and subsequent mass, staggered resignation revealed that while the Former Employee Defendants were still employed at Busey they requested recruitment materials from a representative of Flagstar and then scheduled and attended a WebEx conference during business hours with numerous then-

Busey employees for the purpose of soliciting the employees to resign from Busey Bank and join Flagstar.

51.     On June 11, 2020, Turney forwarded from his personal email to his work email a calendar invite for a WebEx "marketing discussion" sent by Brian O'Connor and Christina Long, employees of Flagstar and Opes Advisors—a subsidiary of Flagstar—respectively. Turney also sent this email to Kellie LaMonaca, one of the former Busey Bank employees who later resigned to join Flagstar. On June 13, 2020, Turney also sent to several Busey employees recruitment information on products offered by Flagstar that he requested on the WebEx meeting with Flagstar representatives. Turney then worked with Flagstar to organize another WebEx recruitment conference (titled "Marketing Review") scheduled for Tuesday, June 23, 2020, during business hours, which included additional Flagstar employees such as Craig Goetz, along with all of the Former Employee Defendants. This series of emails and scheduled WebEx conference invitations is attached as **Composite Exhibit G**.

52.     Following these meetings, Busey Bank's employees began resigning, but prior to doing so, many of sent themselves or others Busey Bank's confidential information.

53.     Turney and LaMonaca continued to work with Flagstar Regional Manager Craig Goetz to solicit other Busey Bank employees over the next several months.

54.     Upon information and belief, LaMonaca remained at Busey Bank to assist in the solicitation and transfer of the remainder of the Former Employee Defendants to Flagstar. As Regional Sales Manager, LaMonaca had control over all of the other Former Employee Defendants. Once all of the other Former Employee Defendants had resigned to join Flagstar, LaMonaca then resigned as well, but not before sending Busey Bank's confidential information to other employees whom she knew were resigning to join Flagstar.

55.     Some Busey Bank employees who did not resign reported that they had been solicited to join Flagstar by other then-Busey Bank employees. Additionally, several Busey Bank employees reported that in conjunction with soliciting these employees to join Flagstar, Turney and Flagstar falsely represented to them that Busey Bank was "getting out of the mortgage business." One such employee is Ms. Debbie Rybka, whose Declaration is attached to this Complaint as **Exhibit H**.

56.     Following the mass resignations, Busey Bank continues to discover evidence indicating that the Former Employee Defendants have solicited and continue to solicit numerous Busey Bank employees and customers.

57.     Turney is now an "Area Manager" at Flagstar, managing many of the individuals he wrongfully solicited away from Busey Bank. Similarly, LaMonaca is now a Branch Manager at Flagstar and, upon information and belief, oversees the remainder of the Former Employee Defendants now employed by Flagstar.

58.     While still employed at Busey Bank, the Former Employee Defendants worked in concert with Flagstar to actively solicit Busey Bank employees. Prior to and following their resignations, the Former Employee Defendants and Related Individuals breached their Agreements with Busey Bank and will continue to do so unless an order enjoining them from doing so is entered.

59.     The need for injunctive relief is buttressed by the various breaches of contract and ongoing damage to Busey Bank's goodwill resulting from the Former Employee Defendants' and Flagstar's continued possession and use of Busey Bank's confidential information.

### ***The Former Employee Defendants and Flagstar Are In Possession and Control Of Busey Bank Confidential Information and Trade Secrets***

60.     Since the mass resignations, Flagstar and its agents, including the Former Employee Defendants and Related Individuals, have contacted and solicited numerous Busey Bank customers.

61.    Upon information and belief, the Former Employee Defendants and Related Individuals have used The Busey Bank Trade Secrets to continue soliciting Busey Bank employees and customers in violation of their Agreements.

62.    On September 24, 2020, Busey Bank employee Michael Ross received a text to his personal cell phone from Mr. Goetz, who solicited Mr. Ross to leave Busey Bank and join Flagstar. *See **Exhibit I**, Text Message From C. Goetz to M. Ross.* On the same day, Mr. Goetz sent the same message to solicit two other Busey Bank employees, Sean Banigan and Carly Varner. Attached as **Exhibits J and K**, respectively. Notably, on the very day that the five employees in Busy Bank's Bloomington office resigned to join Flagstar, October 23, 2020, Mr. Goetz followed up with Ms. Varner again, attempting to solicit her, telling her, among other things, "[y]our old friends speak highly of you!" *See* **Exhibit K**.

63.    Upon information and belief, having already solicited numerous "large teams in Illinois" from Busey to Flagstar as referenced in the above-referenced text messages,[2] Turney or certain Former Employee Defendants provided Flagstar with personal contact information for Busey Bank employees under his command in an effort to indirectly solicit the employees away from Busey Bank. Without Turney or one of the Former Employee Defendants or Related Individuals providing such information, it is highly unlikely Mr. Goetz at Flagstar would have obtained the personal cell phone numbers of Mr. Ross, Mr. Banigan, and Ms. Varner, and used them with the direct intention of soliciting them to join Flagstar.

64.    Further, upon information and belief, as numerous customers have been solicited away from Busey Bank, resulting in the loss of millions of dollars to Busey Bank, the Former Employee

---

[2] *See supra* Para. 62 and Exhibit J-K.

Defendants provided Flagstar with personal contact information for Busey Bank customers known to them in an effort to directly solicit those customers away from Busey Bank.

65.    Because Defendants' conduct constitutes multiple violations of Federal and Indiana law and has resulted in significant monetary harm and reputational damage to Busey Bank, Busey Bank seeks both immediate injunctive relief and damages.

66.    Moreover, Busey Bank's review of the actions of the Former Employee Defendants leading up to their resignations has revealed that the Former Employee Defendants intentionally removed Busey Bank confidential information and Trade Secrets in the form of customer lists.

67.    On July 24, 2020, Villareal, Weidner, and Sannella resigned. However, just prior to their resignation, LaMonaca emailed Brad Gish's client list to Weidner. This email is attached as **Exhibit L**. LaMonaca's provision of the customer list to Weidner (at a time when LaMonaca knew Weidner was about to resign) demonstrates it was done for the purpose of being used by Weidner on behalf of her new employer, Flagstar. Notably, Weidner was Gish's assistant, and Gish did not resign until weeks later. Upon information and belief, Weidner kept and is still in possession of this list and has likely disseminated and used it. The list contains confidential information for over 50 Busey Bank customers, including, but not limited to, extensive contact information, type of residence, loan amounts, interest rates, types of loans, close dates, loan-to-value ratios, customer credit scores, and co-borrower information and credit scores. Importantly, there are a number of Busey Bank customers whose names appear on this list and who have also already had their loans serviced at Flagstar.

68.    In the days prior to their resignations, Related Individuals Tjernagel, Ommen-Welborn, and Besler sent themselves various Busey Bank documents, including client lists, closings lists, purchase matrices, copies of Closed Loan Commissions, presentations, and other documents

containing thousands of rows of Busey Bank confidential information. These documents include customer names with loan amounts, disbursement dates, loan rates, loan terms, and investor names, loan closing dates, gross and net amounts, volumes, referral sources, and payment status. Upon information and belief, these individuals kept and are still in possession of these documents and have likely disseminated and used them to solicit Busey Bank customers for the benefit of Flagstar.

69.     Similarly, Mark Dietrich emailed at least four documents to himself, including a client list and a Database attached as **Exhibit M**. Combined, these spreadsheets include hundreds of rows of extensive customer information, including borrower names, addresses, birth dates and employers. Dietrich emailed these documents from his Busey Bank email address to his personal email address on September 27, 2020 and then resigned the next day, September 28, 2020. He almost certainly did so to compete against Busey Bank on behalf of Flagstar. Upon information and belief, Dietrich kept and is still in possession of these documents and has likely disseminated and used them to solicit Busey Bank customers for the benefit of Flagstar.

70.     Upon information and belief, as the Former Employee Defendants, Related Individuals, and Flagstar were planning and conspiring for months, the Former Employee Defendants were also misappropriating The Busey Bank Trade Secrets or aiding and abetting others in doing so.

71.     Accordingly, upon information and belief, Defendants and the Related Individuals still have possession of and control over—and have used and will likely continue to use—The Busey Bank Trade Secrets unless enjoined from doing so by the Court.

72.     In an attempt to conserve judicial resources and settle its disputes out-of-court, Busey Bank's counsel spent months attempting to resolve issues related to the wrongful retention and use of Busey Bank's information. However, Defendants have refused to acknowledge any wrongdoing. On October 27 and 28, 2020, Busey Bank sent correspondence, along with litigation

hold letters, to each former employee of Busey Bank identified in this action and to Flagstar demanding written assurances that the former employees would comply with their respective continuing obligations to Busey Bank under the Agreements and federal and state law.

73.    Despite Busey Bank's written demand, Defendants, on information and belief, have not taken any steps to ensure the covenants contained in the Agreements will not be further breached and have refused to provide any assurances that future breaches will not occur.

74.    In addition, the former employees have engaged in business on behalf of Flagstar with customers and referral sources with whom they had contact, and about whom they learned confidential and proprietary information, solely due to their employment with Busey Bank.

75.    Given that Flagstar hired over twenty former Busey Bank employees and allowed the employees to utilize on its behalf and for its benefit confidential and proprietary information of Busey Bank, Flagstar has encouraged and acted in concert and cooperation with the Former Employee Defendants and Related Individuals to engage in the wrongful solicitation of Busey Bank's customers, carriers, and employees, to engage in unfair competition against Busey Bank, and to improperly access and utilize Busey Bank's confidential and proprietary information.

76.    In this manner, Flagstar willfully, knowingly, and intentionally induced the Former Employee Defendants and Related Individuals to breach their respective covenants and obligations under the Agreements with the purpose of injuring Busey Bank's business and obtaining an unfair competitive advantage.

77.    Flagstar and the Former Employee Defendants continue to engage in activities that violate the Agreements, tortiously interfere with Busey Bank's contracts and business relationships, cause the actual or threatened misappropriation of Busey Bank Trade Secrets, and unfairly compete with Busey Bank.

78.     Busey Bank will continue to suffer irreparable harm unless this Court grants injunctive relief restraining Defendants from further breaches of Busey Bank's rights.

## COUNT I

## TEMPORARY AND PRELIMINARY INJUNCTION

79.     The allegations of Paragraphs 1 through 78 are incorporated by reference herein with the same force and effect as if set forth in full below.

80.     By virtue of the foregoing, (a) Defendants have caused and will continue to cause irreparable injury to Busey Bank unless injunctive relief is granted; (b) the threatened injury to Busey Bank outweighs the harm to Defendants resulting from the grant of injunctive relief; (c) the injunction is not adverse to public interest; (d) Busey Bank has a substantial likelihood of success on the merits; and (e) the balancing of the equities favors the issuance of an injunction against Defendants in favor of Busey Bank.

81.     Unless Defendants are temporarily and/or preliminarily enjoined from making fraudulent misrepresentations regarding Busey Bank, retaining and using The Busey Bank Trade Secrets, and soliciting Busey Bank customers and employees Busey Bank will continue to be irreparably harmed by: (a) the disclosure and misuse of trade secrets, client lists, and/or other confidential information that are solely the property of Busey Bank and its clients; (b) the loss of confidentiality of the information contained in clients' records, loss of confidentiality of clients' financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; (c) damage to office stability, and a threat to the enforcement of reasonable contracts; and (d) present economic loss, which is, to a degree, unascertainable at this time, and future economic loss, which is presently incalculable.

82.     Busey Bank otherwise has no adequate remedies at law.

## COUNT II

## UNFAIR COMPETITION

83.    The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

84.    Within the restricted time period in the employee non-solicitation provisions of the Agreements, Flagstar, with the assistance of the Former Employee Defendants, both before and after their affiliation with Flagstar, has systematically raided Busey Bank's mortgage loan origination workforce in order to (a) bolster and expand its own business performance in a competitive market, (b) establish a new and immediately competitive mortgage loan, and (c) obtain and exploit Busey Bank's confidential, proprietary, trade secret, and highly sensitive business information. This raiding has been at Busey Bank's expense.

85.    Defendants' misconduct constitutes a misappropriation of Busey Bank's labors and expenditures, constitutes unfair competition, and improperly undermines the stability of Busey Bank's workforce.

86.    Indiana courts have recognized that raiding a competitor's workforce with the intent to cripple its business, or part of its business, is actionable. *Genesys Telecommunications Lab'ys, Inc. v. Morales*, No. 119CV00695TWPDML, 2019 WL 5722225, at *17 (S.D. Ind. Nov. 5, 2019) (citing *CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1063–64 (S.D. Ind. 2010)).

87.    Unless enjoined, Defendants will continue to raid Busey Bank's workforce in order to bolster and expand their business performance and obtain and continue to exploit Busey Bank's confidential, proprietary, and highly sensitive business information, all at Busey Bank's expense.

88.    Busey Bank has suffered, and will continue to suffer, irreparable harm as the result of the aforementioned unfair competition.

89.     Busey Bank has no adequate remedy at law. The injury to Busey Bank's business is not easily quantified, and monetary damages cannot by themselves adequately compensate Busey Bank for the competitive injury resulting from Defendants' unfair competition.

90.     The balance of hardships and the public's interest favor granting injunctive relief in favor of Busey Bank and enjoining Defendants' from unfairly competing with Busey Bank.

91.     As a direct and proximate result of Defendants' wrongful acts, Busey Bank has suffered damages in an amount to be determined at trial.

## COUNT III

## MISAPPROPRIATION OF TRADE SECRETS

### (Violation of Indiana Trade Secrets Act, I.C. 24–2–3–1, *et seq.*) (as to all Defendants)

92.     The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

93.     The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Defendants under the Indiana Trade Secrets Act, I.C. 24–2–3–1, *et seq.* (the "ITSA").

94.     Busey Bank assigned and referred clients to the Former Employee Defendants so that they could service them on Busey Bank's behalf. Busey Bank provided the Former Employee Defendants with confidential information solely for the purpose of performing their jobs at Busey Bank, and continually updated that information throughout the years that the Former Employee Defendants were employed with Busey Bank.

95.     The Busey Bank Trade Secrets client information is not generally known by third parties, and is not readily ascertainable by proper means by third parties.

21

96.     Busey Bank derives significant economic and competitive advantages in the financial services industry from maintaining the secrecy and confidentiality of its trade secret client information.

97.     The Busey Bank Trade Secrets client information, including the names, addresses, phone numbers, account and loan information, and other information concerning the customers and loans assigned to the Former Employee Defendants, is subject to reasonable efforts by Busey Bank to maintain its secrecy, and its employees are required to maintain the secrecy and/or confidentiality of that information.

98.     Busey Bank's confidential information constitutes a trade secret under the ITSA.

99.     In addition, the names, addresses and contact information of Busey Bank clients are protected from disclosure as personally identifiable information under the Gramm-Leach-Bliley Act and its implementing federal regulations, commonly referred to as Regulation S-P. *See* 17 C.F.R. § 248. Even the fact that an individual is a client of a specific financial institution – here, Busey Bank – is protected from disclosure under Regulation S-P. 17 C.F.R. § 248.3. These federal regulations underscore the highly confidential nature of financial services client information.

100.    The Former Employee Defendants have improperly and without authorization misappropriated, retained, and/or exploited The Busey Bank Trade Secrets, including Busey Bank's confidential client information. Upon information and belief, they have done so for the purposes of aiding their solicitation of Busey Bank clients to have their loans serviced by Flagstar, a competing bank with which they have all become associated.

101.    The Former Employee Defendants' continued retention of The Busey Bank Trade Secrets client information constitutes actual and threatened misappropriation of trade secrets pursuant to the ITSA and is willful and malicious.

102.    Because Defendants' unlawful conduct is ongoing, Busey Bank faces a threat of continuing irreparable harm for which Busey Bank lacks any adequate remedies at law.

103.    Unless Defendants are enjoined from the foregoing conduct, Busey Bank will be irreparably harmed by: (a) disclosure of The Busey Bank Trade Secrets client information, including confidential account information that is solely the property of Busey Bank; (b) loss of goodwill; and (c) present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable. An award of money damages alone will be insufficient and inadequate to remedy Busey Bank's injuries arising out of the misappropriation of its trade secrets.

## COUNT IV

### Violations of Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836(b)<br>(as to all Defendants)

104.    The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

105.    Busey Bank is the owner of valuable trade secrets used in, or intended for use in, interstate or foreign commerce. Those trade secrets include, but are not limited to, detailed compilations of customer information, competitive loan information, referral source information, history and performance information, sales records and documents, marketing and sales strategies, long- range plans, competitive strategies, and personnel related information.

106.    This information constitutes "trade secrets" under 18 U.S.C. § 1839(3) because (a) it is sufficiently secret to derive economic value from not being generally known to other persons who can obtain economic value from its disclosure or use; and (b) Busey Bank takes reasonable measures to safeguard the secrecy of the information.

23

107.    The Former Employee Defendants willfully and intentionally violated their contractual obligations, as well as Busey Bank policies, and diverted The Busey Bank Trade Secrets to themselves and others for use in their employment with Flagstar.

108.    Upon information and belief, by accepting positions with Flagstar, one or more of the Former Employee Defendants and Related Individuals have disclosed or will disclose, and/or have used or will use, The Busey Bank Trade Secrets for the benefit of Flagstar.

109.    Flagstar knows or should know that the Former Employee Defendants and Related Individuals acquired the trade secrets by improper means, and Flagstar likely encouraged them to do so.

110.    The Busey Bank Trade Secrets, as described in the preceding paragraphs, derive independent economic value from the fact that they are not generally known by, and are not readily ascertainable through proper means by, the general public or Busey Bank's competitors.

111.    The Busey Bank Trade Secrets represent the results of substantial efforts and investments by Busey Bank.

112.    Busey Bank also takes extraordinary measures to maintain the continued secrecy of its trade secret information, including, but not limited to, installing password protection of its electronically-stored information, limiting access to those who need such information, and requiring password protection, and passcodes and ID badges to gain access to technology and areas of the building in which confidential information is stored.

113.    By using and/or threatening to use The Busey Bank Trade Secrets in its business, Flagstar has misappropriated The Busey Bank Trade Secrets as defined in 18 U.S.C. § 1839(5).

114.    Defendants' misappropriation and/or threatened misappropriation of The Busey Bank Trade Secrets are willful and malicious.

115.    Under 18 U.S.C. § 1836(b)(3), Defendants' misappropriation and/or threatened misappropriation of trade secrets may—and should—be enjoined by the Court.

## COUNT V

### Violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030 et seq.) (as to Former Employee Defendants)

116.    The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

117.    The Computer Fraud and Abuse Act (the "CFAA") provides a trespass-like civil remedy under federal law when a third party accesses a database, website, or other protected computer, without permission or exceeds authorized access. Specifically, the CFAA provides for the entry of civil injunctive relief as well as the recovery of money damages for a violation of its provisions. *See Sprint Sols., Inc. v. Aldridge*, 50 F. Supp. 3d 1024 (S.D. Ind. 2014) (holding that the plaintiff was "entitled to damages and **injunctive** relief on the claims as set forth in the Complaint," which claims are similar to those asserted herein).[3]

118.    The CFAA prohibits a number of specific acts of misconduct involving access to protected computers (and mobile phones or other computerized devices).

119.    The CFAA "provides two ways of committing the crime of improperly accessing a protected computer: (1) obtaining access without authorization; and (2) ***obtaining access with***

---

[3] *See also Mintel Int'l Grp., Ltd. v. Neergheen*, No. 08-CV-3939, 2008 WL 2782818, at *2 (N.D. Ill. July 16, 2008) (quoting 18 U.S.C. § 1030(g)) (providing that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief"). In *Mintel,* the court stated, "Courts have upheld the use of the CFAA in granting injunctive relief against former employees and their new employers who have attempted to obtain a competitive edge by removing information from a former employer's computers." *Id. See, also*, *YourNetDating, LLC v. Mitchell*, 88 F.Supp.2d 870, 872 (N.D. Ill. 2000) (granting TRO under CFAA claim against former employee); *see also Charles Schwab & Co., Inc. v. Carter*, 2005 WL 351929, at *3 (N.D. Ill. Feb.11, 2005) (denying motion to dismiss claim under CFAA); *George S. May Int'l Co. v. Hostetler*, 2004 WL 1197395, at *3 (N.D. Ill. May 28, 2004).

*__authorization but then using that access improperly__*." Musacchio v. United States, 136 S. Ct. 709, 713 (2016) (emphasis added). As explained by the Fifth Circuit, "courts have interpreted 'access without authorization' as targeting outsiders who access victim systems, while 'exceeds authorized access' is applied to 'insiders, such as employees of a victim company…. [The CFAA punishes] those who have no permission to access a system and those who have some permission to access but exceed it ….'" *United States v. Thomas*, 877 F.3d 591, 596 (5th Cir. 2017) (citations omitted).

120.    The Former Employee Defendants' misconduct in the instant case falls squarely under 18 U.S.C.A. § 1030(a)(4), which provides that a violation occurs when an individual "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value."

121.    The Former Employee Defendants are liable under the CFAA for a multitude of reasons. By virtue of their breaches of fiduciary duties, their agency relationship with Busey Bank terminated, along with their authorized access to The Busey Bank Trade Secrets. A breach of a duty of loyalty can terminate an agency relationship and termination of that relationship makes the accessing of computer files that had previously been authorized transform unauthorized under the CFAA. *NCMIC Fin. Corp. v. Artino*, 638 F. Supp. 2d 1042, 1060 (S.D. Iowa 2009), *modified* No. 4:07-CV-00204-JEG, 2009 WL 10669611 (S.D. Iowa Nov. 10, 2009).

122.    "[T]he authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal."[4] In the similar case of *Artino,* the court found this event occurred when the defendant "decided to compete against [plaintiff] and subsequently e-mailed [plainitff's] customer spreadsheet to his personal e-

---

[4] *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F.Supp.2d 1121, 1126 (W.D.Wash.2000) (quoting Restatement (Second) of Agency § 11).

mail account."[5] Similarly, the Former Employee Defendants in the instant case are guilty of the same conduct and the resulting termination of their agency relationships with Busey Bank makes their access to Busey Bank computer files, which were previously authorized, unauthorized under the CFAA. *Id.* Much like the defendant in *Aritno,* where the court found that the defendant acted "without authorization" or "exceeded authorized access" within the meaning of the CFAA, the Former Employee Defendants committed the same misdeeds in this case.

123.    Indiana and the Seventh Circuit follow this same analysis. *See* Meridian Fin. Advisors, Ltd. v. Pence, 763 F. Supp. 2d 1046, 1062 (S.D. Ind. 2011) (citing *Int'l Airport Ctrs., LLC v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006)) ("The Seventh Circuit recognizes that previously authorized use of a computer system may become unauthorized when an employee breaches his duty of loyalty to his employer.").

124.    In addition, the Former Employee Defendants' conduct breached Busey Bank's computer policies and the Confidentiality and Computer Use and Authorization provisions in the Agreements. *See supra* Paragraph 38. Courts have held that these types of violations give rise to a CFAA violation.[6]

125.    The Former Employee Defendants acted "without authorization" or "exceeded authorized access" within the meaning of the CFAA. They acted with intent to defraud Busey Bank under the CFAA when they violated Busey Bank's property rights to obtain something of value by accessing its customer spreadsheets and e-mailing confidential information from their work e-mail accounts to their personal e-mail accounts, or otherwise retaining the same, without authorization, and by

---

[5] *Artino*, 638 F. Supp. 2d at 1061.
[6] *See EF Cultural Travel BV v. Zefer Corp*., 318 F.3d 58, 62 (1st Cir. 2003) (holding that an employee breached his confidentiality agreement with his ex-employer when the employee used confidential information he obtained as an employee to obtain information from his ex-employer's website thereby exceeding his authorized access in violation of the CFAA).

using the customer spreadsheets and other Busey Bank documents and information for their own personal gain and against Busey Bank's financial interests. 18 U.S.C.A. § 1030(a)(4).

126.     As a direct and proximate result of the Former Employee Defendants' actions, Busey Bank has suffered damages in an amount to be proven at trial.

## COUNT VI

## FAITHLESS SERVANT DOCTRINE (as to the Former Employee Defendants)

127.     The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

128.     The Seventh Circuit joins many other circuits and states in recognizing the Faithless Servant Doctrine, which provides that an employee who violates his or her duty of loyalty or fidelity in the performance of his or her employment duties forfeits the right to compensation therefor. *See generally Sidway v. Am. Mortg. Co.*, 222 Ill. 270, 275, 78 N.E. 561, 563 (1906) ("The law is that the agent is entitled to his commission only upon a due and faithful performance of all the duties of his agency in regard to his principal . . . If the agent does not perform his appropriate duties, or if he is guilty of gross negligence or gross misconduct or gross unskillfulness in the business of his agency, he will not only become liable to his principal for any damages which he may sustain thereby, but he will also forfeit all his commissions.") (quoting *Story on Agency*, § 331; 1 AM. & ENG. ENCY. OF LAW (2d Ed.) 1101 (internal citations omitted)); *Salus Capital Partners, LLC v. Moser*, 289 F. Supp. 3d 468 (S.D. N.Y. 2018) (finding that an employee who is found to be faithless in his performance of services to his employer is generally liable for all compensation received from the date of the breach, regardless of whether the faithlessness caused damages) (*applying New York law*); *see also Hartford Elevator, Inc. v. Lauer*, 94 Wis. 2d 571, 585, 289 N.W.2d 280, 287 (1980); *Grace v. E. J. Kozin Co.*, 538 F.2d 170, 175 (7th Cir. 1976)

28

(Concluding that, in the event an employee breaches his duty of loyalty, compensation should be forfeited as a deterrent to wrongful conduct).

129.    While still employed and compensated by Busey Bank, the Former Employee Defendants were faithless in their duties to their employer by virtue of their misconduct in conspiring to misappropriate The Busey Bank Trade Secrets, violate contractual obligations, divert business opportunities to a competitor, and breach their duties of loyalty to Busey Bank.

130.    As such, under the Faithless Servant Doctrine, the Former Employee Defendants are liable to forfeit all compensation paid to them during their time of disloyalty, which would span a period of several months, but no later than June 11 of 2020 (with the expectation that further discovery will result in an even earlier date) through the dates of resignation of each Former Employee Defendant: Christa A. Smith (August 28, 2020), Casey Joanne-Elaine Wilson (August 7, 2020), Kimberly Ann Sannella (July 24, 2020), Kyle R. Bernfield (August 28, 2020), Mark Thomas Dietrich (September 28, 2020), and Kellie Marie LaMonaca (September 4, 2020).

## COUNT VII

### BREACH OF FIDUCIARY DUTIES (as to the Former Employee Defendants)

131.    The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

132.    The Former Employee Defendants and Related Individuals owed fiduciary duties to their employer.

133.    In a recent Consent Order with a mortgage loan originator, the Office of the Comptroller of the Currency ("OCC") found that mortgage loan originators, like those involved in this case, owe fiduciary duties to their employers. *See In the Matter of: Stacy Folkers Former Residential Loan Originator Barrington Bank & Trust Company, N.a. Barrington, Illinois*, 2018 WL 3844493,

at *1. The Consent Order found that while still employed by one bank, the Respondent sent customers' information to the financial institution at which she had accepted a new position, and several of those customers eventually obtained loans from the second financial institution, which resulted in approximately $1.14 million in mortgage loans from that institution and some pecuniary benefit to her personally. *See id.* The OCC found that the "Respondent recklessly engaged in unsafe or unsound practices and breached her fiduciary duty to the Bank; which practices and breaches were part of a pattern of misconduct, caused or were likely to cause more than a minimal loss to the Bank, and resulted in pecuniary gain to Respondent."

134. In general, under Indiana law, employees owe their employers a duty of loyalty. *See Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1070 (Ind. Ct. App. 2007). When dealing with this particular duty, "an employee who plans to leave his current job and go into competition with his current employer must walk a fine line." *Id.* As stated by the Indiana Court of Appeals:

> Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer. But an employee may even make arrangements to compete, such as investments or the purchase of a rival corporation or equipment, except that he cannot properly use confidential information peculiar to his employer's business, before he leaves his employ.... [These principles] balance the concern for the 'integrity of the employment relationship' against the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty.

*Potts v. Review Bd. of Ind. Employment Sec. Div.*, 475 N.E.2d 708, 712 (Ind. Ct. App. 1985) (internal citations omitted). Further, "misappropriating an employer's confidential information is of course a breach of the duty of loyalty. *See Magnesita Refractories Co. v. Mishra*, No. 2:16-CV-524-PPS-JEM, 2018 WL 6435648, at *14 (N.D. Ind. Dec. 7, 2018) (citing *N. Elec. Co. v. Torma*, 819 N.E.2d 417, 430 (Ind. Ct. App. 2004)).

135.    The Former Employee Defendants owed fiduciary duties to Busey Bank, which included not competing with Busey Bank while still in its employ.[7]

136.    Similarly, Flagstar with the cooperation and assistance of the Former Employee Defendants setup multiple recruitment and informational meetings with other Busey Bank employees during business hours for the purpose of soliciting the individuals away from Busey Bank. This constitutes a clear breach of the Former Employee Defendants' fiduciary duties to their employer.[8]

137.    Many of the individuals who took part in the mass, staggered resignation scheme also took customer lists. LaMonaca, while still employed, sent one such list to Weidner the morning of her resignation, presumably for her use at Flagstar. LaMonaca remained employed by Busey for another month thereafter.

138.    The Former Employee Defendants intentionally breached their fiduciary duties owed to their employer, Busey Bank.

139.    The Former Employee Defendants' breaches of their fiduciary duties to Busey Bank have damaged Busey Bank.

140.    Busey Bank's remedies as a result of the Former Employee Defendants' breaches of their fiduciary duties include recovery of the employees' total compensation paid during the time the employees were breaching their fiduciaries duties,[9] the imposition of a constructive trust to collect the profits reaped by the employees as a result of their breaches of fiduciary duties,[10] recovery of

---

[7] See supra, Potts, 475 N.E.2d at 712; Magnesita, 2018 WL 6435648, at *14.
[8] See id.
[9] See Dowd and Dowd, Ltd. v. Gleason, 816 N.E.2d 754, 772 (1st Dist. 2004); see also Levy v. Markal Sales Corporation, 268 Ill.App.3d 355, 373, 643 N.E.2d 1206 (1st Dist. 1994).
[10] See Lindenhurst Drugs, Inc. v. Becker, 154 Ill.App.3d 61, 71, 506 N.E.2d 645, 650 (2d Dist. 1987); see also Hill v. Names & Addresses, 212 Ill.App.3d 1065, 1083, 571 N.E.2d 1085 (1st Dist. 1991) (constructive trust may be imposed even when it more than compensates plaintiff for injury resulting from breach of

bonuses paid during the same period in which the employees breached their fiduciary duties,[11] the imposition of punitive damages if the breaches were intentional and without just cause,[12] and injunctive relief.[13]

## COUNT VIII

## CIVIL CONSPIRACY

141.     The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

142.     Upon information and belief, Flagstar and the Former Employee Defendants were aware of the contractual obligations owed by the individuals who engaged in the mass, staggered resignations from Busey Bank under the Agreements.

143.     Upon information and belief, Flagstar and the Former Employee Defendants knowingly and willingly conspired and agreed between themselves to breach the customer and employee non-solicitation provisions of the Agreements, the Former Employee Defendants' fiduciary duties to Busey Bank, and/or confidentiality provisions contained in the Agreements.

144.     The objective Flagstar and the Former Employee Defendants sought to achieve—and indeed accomplished—was to gain an improper and unfair competitive advantage, injure Busey Bank's business, and strain Busey Bank's customer and employee relationships.

145.     Flagstar and the Former Employee Defendants committed and caused to be committed one or more overt and unlawful acts in furtherance of the conspiracy, including, but not limited to, the

---

loyalty because the right to recover from one who exploits his fiduciary position for his personal benefit is triggered by gain to agent rather than loss to principal).

[11] *See Gleason*, 816 N.E.2d at 772.

[12] *See Hill*, 511 N.E.2d at 1098; *Gleason*, 816 N.E.2d at 773; *Markal Sales*, 268 Ill.App.3d at 379.

[13] *See Superior Environmental Corp. v. Mangan*, 247 F.Supp.3d 1001, 1003 (N.D.Ill. 2003).

misappropriation of The Busey Bank Trade Secrets, the solicitation of Busey Bank employees, and the solicitation of Busey Bank customers.

146. As a direct and proximate result of Flagstar's and the Former Employee Defendants' actions, Busey Bank has suffered damages in an amount to be determined at trial.

### COUNT IX

### TORTIOUS INTERFERENCE WITH BUSEY BANK'S BUSINESS RELATIONSHIPS AND/OR EXPECTANCY WITH ITS CUSTOMERS

147. The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

148. At all relevant times, Busey Bank had business relationships with its customers.

149. At all relevant times, Busey Bank reasonably expected that its business relationships with its customers would continue and Busey Bank invested time, effort, and money in developing and maintaining those business relationships.

150. Flagstar and the Former Employee Defendants knew and were aware of the business relationships between Busey Bank and its customers.

151. Flagstar and the Former Employee Defendants intentionally, willfully, and without justification interfered with Busey Bank's business relationships with its customers by soliciting, or otherwise conducting business with, Busey Bank's customers and by inducing Busey Bank's former employees to breach their post-employment contractual obligations to Busey Bank, to solicit Busey Bank's customers, and to disclose Busey Bank's confidential information.

152. Specifically, LaMonaca, who had a managerial role as Regional Sales Manager, was acutely aware of the business relationships serviced by herself and the other Former Employees and Related Individuals, and knew that by soliciting the customers along with the other Former Employees and Related Individuals she would be interfering with those relationships. LaMonaca

was further aware of the significant value of the relationships to Busey Bank, and the detrimental impacts her actions would have on its mortgage business.

153.    Defendants' purposeful and improper interference has had the intended effect as over twenty former employees have moved the business of Busey Bank customers to Flagstar.

154.    Unless enjoined, Flagstar will continue to induce the former Busey Bank employees to breach their respective Agreements, to solicit Busey Bank's customers, and to disclose Busey Bank's confidential information, in order to solicit Busey Bank's customers for the benefit of Flagstar.

155.    Busey Bank has suffered, and will continue to suffer, irreparable harm as the result of Defendants' interference with its business relationships and/or expectancy with its customers.

156.    Busey Bank has no adequate remedy at law. The injury to Busey Bank's business is not easily quantified, and monetary damages cannot by themselves adequately compensate Busey Bank for the competitive injury resulting from Defendants' intentional and improper interference with Busey Bank's business relationships and/or expectancy with its customers.

157.    The balance of hardships and the public's interest favor granting injunctive relief in favor of Busey Bank and enjoining Defendants from wrongfully and improperly interfering with Busey Bank's business relationships and/or expectancy with its customers.

158.    As a direct and proximate result of Defendants' wrongful acts, Busey Bank also has suffered damages in an amount to be proven at trial.

## COUNT X

## TORTIOUS INTERFERENCE WITH BUSEY BANK'S AGREEMENTS

159.    The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below.

160. The Agreements are valid and enforceable contracts as between Busey Bank and the Former Employee Defendants.

161. Busey Bank possesses valid and valuable contractual relationships with its employees, like the Former Employee Defendants and Related Individuals, and Busey Bank achieves economic gain as a result of its contractual relationships with its employees.

162. Specifically, LaMonaca's managerial role imputed a heightened duty owed to Busey Bank, as well as a heightened understanding of the Agreements and the value of Busey Bank's employees. LaMonaca exercised management-level authority over the Former Employee Defendants to influence their decisions. LaMonaca was acutely aware of the Agreements between Busey Bank and the Former Employees Defendants and Related Individuals, and knew that by soliciting the customers along with the other Former Employees Defendants and Related Individuals she would be interfering with the Agreements. LaMonaca was further aware of the great value of the Agreements and relationships to Busey Bank, and the detrimental impacts her actions would have on Busey Bank's mortgage business.

163. Upon information and belief, Defendants knew and were aware of the contractual relationships and obligations between Busey Bank and the former employees who engaged in the staggered, mass resignation from Busey Bank.

164. Upon information and belief, Defendants have intentionally, willfully, and without justification induced or attempted to induce the former employees to breach their obligations under their Agreements.

165. As a result of Defendants' wrongful actions, the Former Employee Defendants and other former employees breached provisions of the Agreements, resulting in (a) an unfair competitive advantage to a Busey Bank competitor; and (b) the use and/or disclosure of Busey Bank's

confidential information and the misuse of the goodwill that Busey Bank developed with its customers and employees for the benefit of Flagstar and to the detriment of Busey Bank.

166.    Unless enjoined, Defendants will continue to induce the former employees to violate their respective Agreements and facilitate their providing an improper competitive advantage to a Busey Bank competitor.

167.    Busey Bank has suffered, and will continue to suffer, irreparable harm as the result of Defendants' interference with the Agreements, and the resulting breach of customer and employee non-solicitation provisions and the use and disclosure of Busey Bank's confidential information.

168.    Busey Bank has no adequate remedy at law. The injury to Busey Bank's business is not easily quantified, and monetary damages cannot by themselves adequately compensate Busey Bank for the competitive injury resulting from the breach of the Agreements induced by Defendants.

169.    The balance of hardships and the public's interest favor granting injunctive relief in favor of Busey Bank and enjoining Defendants from inducing any further breaches of the Agreements and making use of or disclosing Busey Bank confidential information.

170.    As a direct and proximate result of Defendants' wrongful acts, Busey Bank has suffered damages in an amount to be proven at trial.

## COUNT XI

### Breach of Contract (as to the Former Employee Defendants with Agreements)

171.    The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below

172.    The Agreements are valid and enforceable contracts between Busey Bank and the Former Employee Defendants.

36

173.    The Former Employee Defendants have breached the confidentiality, non-solicitation of customers and employees, and computer use and authorization provisions of the Agreements.

174.    Busey Bank has performed all of its obligations to the Former Employee Defendants under their respective Agreements.

175.    The Former Employee Defendants have breached the non-solicitation provisions of their respective Agreements by inducing or assisting other former Busey Bank employees to leave Busey Bank for Flagstar and by soliciting Busey Bank customers to take their business to Flagstar.

176.    Busey Bank has ascertainable rights and protectable interests in its confidential information, employee data, and in maintaining a stable workforce.

177.    The employee and customer non-solicitation provisions are reasonably necessary and narrowly tailored to protect Busey Bank's ascertainable rights and protectable legitimate business interests.

178.    Further, the time limitation regarding the non-solicitation provisions is only twelve months, which is a reasonable period of time.

179.    The Former Employee Defendants' breaches of the employee and customer non-solicitation provisions contained in their respective Agreements have caused and will continue to cause Busey Bank irreparable harm, including lost business, lost goodwill, and strained customer relationships.

180.    The Former Employee Defendants' continued and further breaches of the employee and customer non-solicitation provisions contained in their respective Agreements will cause, and have caused, Busey Bank to suffer lost business, business costs related to a decline in the stability of its workforce, lost goodwill, and erosion of its customer relationships.

181.    Busey Bank has no adequate remedy at law.

182.    The balance of hardships and the public's interest favor granting injunctive relief in favor of Busey Bank and enjoining the Former Employee Defendants from any further breaches of their respective Agreements.

183.    Further, as a consequence of the Former Employee Defendants breaches of the employee and customer non-solicitation provisions of their respective Agreements, Busey Bank has suffered damages in an amount to be proven at trial.

## COUNT XII

### Inducement of Breach of Fiduciary Duty (as to Flagstar)

184.    The allegations of Paragraphs 1 through 78 are incorporated herein by reference with the same force and effect as if set forth in full below

185.    While still serving as a manager and employee of Busey Bank, LaMonaca collaborated with Flagstar and conspired along with over twenty other employees to leave Busey Bank and join Flagstar. Flagstar, had the simple goal of stealing Busey Bank's productive employees and thereby Busey Bank's Indiana and Illinois mortgage business.

186.    Flagstar induced the Former Employee Defendants and Related Individuals to breach their fiduciary duties through Flagstar's promises and assurances of future compensation.

187.    Flagstar knowingly accepted the benefits of the breaches of fiduciary duty.

188.    Busey Bank has suffered and will continue to suffer significant damages resulting from Flagstar's tortious conduct.

189.    Busey Bank's relationships with its employees has been irreparably harmed. This harm is ongoing, and as a direct result of Defendants' wrongful conduct will continue to cause tremendous damage to Busey Bank in the forms of lost goodwill and lost profits, among other things.

## PRAYER FOR RELIEF

**WHEREFORE**, by virtue of the foregoing acts and conduct complained of in Counts I through XII, Busey Bank respectfully requests entry of injunctive relief, an award of damages, and other appropriate relief against Defendants, including, but not limited to, the following:

(1)    That the Court enjoin Defendants, directly or indirectly, and whether alone or in concert with others, from:

a.  using, disclosing, or transmitting for any purpose, including the solicitation or conducting of business with Busey Bank clients, the information contained in the records of Busey Bank, or other information pertaining to Busey Bank clients, including, but not limited to, the names, addresses, email addresses, telephone numbers, personal data and financial information of the clients (excluding members of the Former Employee Defendants' immediate families);

b.  soliciting any business from any customer of Busey Bank whom the Former Employee Defendants serviced at Busey Bank, and/or any customers whose identities the Former Employee Defendants learned as a result of being a employed by or affiliated with Busey Bank (the "Customers"), including for the purpose of inviting, encouraging, or requesting the Customers to divert business from Busey Bank (excluding members of the Former Employee Defendants immediate families); and

c.  destroying, erasing or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer files or other electronic storage media) in the Former Employee Defendants' possession or control which were obtained from, or contain

information derived from, any Busey Bank records, which pertain to Busey Bank's clients, or which relate to any of the events alleged in the Complaint in this action.

(2)     That the Former Employee Defendants be compelled, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of the Former Employee Defendants' new employer to provide to Busey Bank's counsel any and all records or information pertaining to Busey Bank's clients or its business, and/or which were obtained by Defendants as a result of being an employee of Busey Bank, whether in original, copied, handwritten or any other form, and purge any such records and information from their possession, custody, or control, within 48 hours of notice to Defendants or their counsel of the terms of the Court's Order; provided, however, that any records and information in computerized or electronic form (including but not limited to personal computers, laptop computers, tablet devices, iPhones, Android phones, mobile telephones and any other device in, or on, which data can be electronically stored) shall be provided by Defendants to their counsel within 48 hours of notice to Defendants or their counsel of the terms of the Court's Order, and that Defendants' counsel shall preserve the integrity of such devices and immediately make any and all such devices available for inspection and duplication by Busey Bank's counsel and/or computer forensic consultants.

(3)     That the Court award Busey Bank all damages available, including, but not limited to, compensatory damages, punitive damages, unjust enrichment and restitution damages, disgorgement of profits, and exemplary damages;

(4)     That the Court award Busey Bank all of its attorneys' fees incurred in connection with this action;

(5)     That the Court grant Busey Bank such other relief that the Court deems necessary, appropriate, or proper.

Dated:  June 4, 2021                          Respectfully submitted,
                                              RUBIN & LEVIN, P.C.
                                              Attorneys for Busey Bank, an Illinois Banking
                                              Corporation

                                              By: */s/ James E. Rossow Jr.*
                                              James E. Rossow Jr. – Atty. No. 21063-29
                                              Joshua W. Casselman – Atty. No. 27055-49
                                              RUBIN & LEVIN, P.C.
                                              135 N. Pennsylvania Street, Suite 1400
                                              Indianapolis, IN  46204
                                              (317) 634-0300 – FAX: (317) 263-9411
                                              jim@rubin-levin.net
                                              jcasselman@rubin-levin.net

                                                      -and-

                                              Michael S. Taaffe, Esq. *(Motion to Appear Pro Hac Vice to be filed)*
                                              Justin P. Senior, Esq. *(Motion to Appear Pro Hac Vice to be filed)*
                                              Shumaker, Loop & Kendrick, LLP
                                              240 S. Pineapple Ave., Tenth Floor
                                              Sarasota, FL 34236
                                              (941) 364-2717 – FAX: (941) 366-3999
                                              mtaaffe@shumaker.com
                                              jsenior@shumaker.com